NB:MEM
F.# 2018R01341

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   SEP 26 2018   ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

IN THE MATTER OF THE APPLICATION
FOR SEARCH WARRANTS FOR:

THE PREMISES KNOWN AND DESCRIBED
AS THE ESTABLISHED RESIDENCE
LOCATED AT 248 POOSPATUCK LANE,
MASTIC BEACH, NEW YORK,
INCLUDING ANY LOCKED OR CLOSED
CONTAINERS THEREIN AND
OUTBUILDINGS
("SUBJECT PREMISES #1"); AND

THE PREMISES KNOWN AND DESCRIBED
AS THE UNDER CONSTRUCTION
RESIDENCE LOCATED AT 248
POOSPATUCK LANE, MASTIC BEACH,
NEW YORK, INCLUDING ANY
LOCKED OR CLOSED CONTAINERS
THEREIN AND OUTBUILDINGS
("SUBJECT PREMISES #2").
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

TO BE FILED UNDER SEAL

AFFIDAVIT IN SUPPORT
OF APPLICATIONS
FOR SEARCH WARRANTS

(Fed R. Crim. P. 41)



MJ 18- 907

EASTERN DISTRICT OF NEW YORK, SS:

DAVID VALE, being duly sworn, deposes and says that he is a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"), duly appointed according to law and acting as such.

Upon information and belief there is probable cause to believe that there will be kept and concealed within THE PREMISES KNOWN AND DESCRIBED AS THE "ESTABLISHED" RESIDENCE LOCATED AT 248 POOSPATUCK LANE, MASTIC BEACH, NEW YORK, INCLUDING ANY LOCKED OR CLOSED CONTAINERS THEREIN AND OUTBUILDINGS ("SUBJECT PREMISES #1"); AND THE PREMISES

KNOWN AND DESCRIBED AS THE UNDER CONSTRUCTION RESIDENCE LOCATED AT 248 POOSPATUCK LANE, MASTIC BEACH, NEW YORK, INCLUDING ANY LOCKED OR CLOSED CONTAINERS THEREIN AND OUTBUILDINGS ("SUBJECT PREMISES #2") (collectively, the "SUBJECT PREMISES"), further described in Attachments A and B; within the Eastern District of New York, certain property, namely:

(1) drugs, drug paraphernalia, scales, drug residue, dilutants and materials related to distributing and/or manufacturing drugs;

(2) books and records, showing cash transactions, prices and quantities of drugs bought and sold;

(3) books and records showing the names, addresses and telephone numbers of purchasers and suppliers of drugs, as well as the identities of confederates in drug trafficking;

(4) pagers, electronic organizers, cellular telephones and related bills and receipts;

(5) firearms, including firearm ammunition, shell casings, discharged rounds and holsters;

(6) motor vehicle records, telephone bills, property records showing ownership of assets purchased with drug proceeds;

(7) banking and financial records, to include wire transfer receipts, bank deposit and withdrawal slips and any other documents evidencing financial transactions conducted with proceeds;

(8) currency used to purchase drugs, or reflecting proceeds of sales of drugs; and

(9) photographs, photographic negatives (developed and undeveloped), surveillance cameras and corresponding electronic media, and video tapes or disks, which show the identities of conspirators, contraband, and evidence of drug trafficking;

all of which constitute evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846, further described in Attachment C.

The source of your deponent's information and the grounds for his belief are as follows:[1]

I.   INTRODUCTION

    1.   I have been a Special Agent with HSI since 2010[2] and I am currently assigned to the HSI Violent Gangs and Narcotics Task Force. I have participated in investigations into allegations of unlawful possession, distribution and manufacture of controlled substances, including but not limited to heroin, fentanyl, fentanyl analogues and fentanyl-like substances.[3] My investigation into heroin traffickers has involved working with confidential informants, surveillance and controlled purchases of narcotics. The information contained in this affidavit comes from my discussions with other agents and law enforcement officers, including members of the Suffolk County Police Department ("SCPD"), my review of law enforcement reports, and videos obtained by a confidential informant ("CI"),[4] while

---

[1] Because the purpose of this affidavit is solely to set forth probable cause to search, I have not set forth every fact concerning this investigation of which I am aware.

[2] For approximately one year of my tenure as a federal agent, I was assigned to the United States Department of Treasury, Office of the Inspector General for Tax administration. For this period, the majority of the cases I investigated were related to fraud.

[3] Based on my training and experience heroin dealers often times sell a variety of controlled substances to opioid users. Analysis of these substances often times reveals various combinations of heroin, fentanyl or fentanyl analogues. These substances are mixed by dealers in countless combinations and marketed to opioid users as "heroin."

[4] The CI has been working with the SCPD for approximately two months. The CI has proven to be reliable, in that, the information provided by him/her has

under the supervision of law enforcement, as well as a review of the evidence related to this investigation. The CI has informed the SCPD that the CI had purchased heroin from TAMIEN TRENT ("TRENT") between February 2015 to September 11, 2018.

II.  THE SUBJECT PREMISES

   A.  SUBJECT PREMISES #1

   2.  As set forth below, TRENT is believed to utilize SUBJECT PREMISES #1 for the possession and distribution of heroin. SUBJECT PREMISES #1 and SUBJECT PREMISES #2 are both located on the property of 248 Poospatuck Lane, Mastic Beach. 248 Poospatuck Lane is located near a white picket fence with a mailbox attached bearing the number "214." The Sitting Bull Smoke Shop is located directly south of SUBJECT PREMISES #1. The SUBJECT PREMISES share an approximately 50-foot asphalt driveway. The driveway is located approximately 50 feet north of the mailbox bearing "214." SUBJECT PREMISES #1 is a tan one-level ranch style home, with approximately six windows with burgundy colored shutters. SUBJECT PREMISES #1 has a small wooden porch on the south side of the structure with approximately three steps. There is an entrance to SUBJECT PREMISES #1 located to the west at the top of the three steps. The south side of SUBJECT PREMISES #1 has a larger wooden porch with white railings and steps leading to an entrance door of the residence. There is a detached garage located behind the SUBJECT PREMISES #1. A photograph of SUBJECT PREMISES #1 is attached hereto as Exhibit A and incorporated by reference herein.

---

been corroborated by other sources of information, including surveillance by law enforcement officers, audio and video recordings of TRENT distributing heroin and other cooperating sources.

B.  SUBJECT PREMISES #2

3. SUBJECT PREMISES #2 is a blue colored, two-story center hall colonial residence, which is currently under construction. SUBJECT PREMISES #2 has trim surrounding the windows and gutters. SUBJECT PREMISES #2 has a portico supported by two white columns directly over the front entrance to the residence. SUBJECT PREMISES #2 has a two-car attached garage on the eastside of house. A photograph of SUBJECT PREMISES #2 is attached hereto as Exhibit B and incorporated by reference herein. As set forth below, it is believed that TRENT utilizes SUBJECT PREMISES #2 to store heroin.

III. PROBABLE CAUSE

A.  PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES

4. Since approximately April 2017, law enforcement authorities have been investigating TRENT for distributing heroin in Mastic Beach, New York and surrounding communities on Long Island. On September 26, 2018, a grand jury sitting in the Eastern District of New York returned a thirteen-count indictment charging, among other things, that between September 2014 and September 2018, TRENT conspired to distribute and distributed heroin, and, utilized firearms in connection with his drug trafficking crimes. As part of the investigation, law enforcement utilized the CI. More specifically, the CI acting at the discretion of law enforcement officers, purchased heroin from TRENT on five occasions, each of which is described below.

5. The CI has been purchasing narcotics from TRENT for approximately two years. During that time period the CI is familiar with TRENT's voice, and TRENT's physical appearance. Further, the CI has contacted TRENT on telephone number (631) 381-2943 ("Phone #1") on numerous occasions to arrange the purchase of narcotics.

6. On August 3, 2018, the CI contacted TRENT to arrange the purchase of heroin by calling Phone #1. TRENT directed the CI to the vicinity of the SUBJECT PREMISES. Under the direction of law enforcement, the CI traveled to an area near the driveway associated with the SUBJECT PREMISES, and, upon arriving, sent a text message to PHONE #1 indicating he/she had arrived. A short time later TRENT exited SUBJECT PREMISES #1, entered a dark colored Sports Utility Vehicle and drove to the CI's car. The CI exited his/her vehicle and approached TRENT who remained inside the Sports Utility Vehicle. TRENT then handed the CI a bag of powder, which Trent stated was fifteen grams of heroin in exchange for $1,000. TRENT then told the CI that if the CI wanted heroin in the future he/she should contact TRENT at (862) 223-2239 (Phone #2).[5] The bag of powder was subsequently sent to the Drug Enforcement Administration ("DEA") Laboratory for analysis where the bag of powder tested positive for the presence of heroin. The transaction was recorded with both audio and video recording devices.

7. On August 7, 2018, the CI contacted TRENT to arrange the purchase of heroin by calling Phone #2. TRENT again directed the CI to the SUBJECT PREMISES. As the CI approached the area of the SUBJECT PREMISES he/she observed Trent standing in front of SUBJECT PREMISES #1. The CI subsequently approached TRENT, and TRENT directed the CI to SUBJECT PREMISES #2. TRENT and the CI entered SUBJECT PREMISES #2 together. While inside SUBJECT PREMISES #2 TRENT handed the CI a bag of powder, which TRENT stated was heroin, in exchange for $2,000. The bag of powder

---

[5] In my experience those who traffic in heroin often switch telephone numbers in an effort to avoid detection by law enforcement.

was subsequently sent to the DEA Laboratory for analysis where the bag of powder tested positive for the presence of heroin. The transaction was recorded with both audio and video recording devices.

8. On August 10, 2018, the CI contacted TRENT to arrange the purchase of heroin by calling Phone #2. TRENT directed the CI to the SUBJECT PREMISES. As the CI approached the area of the SUBJECT PREMISES he/she observed TRENT seated inside of a dark colored Nissan Sports Utility Vehicle in the driveway associated with the SUBJECT PREMISES. TRENT told the CI to park his/her vehicle and get into TRENT's car. Inside TRENT's car, TRENT handed the CI a bag of powder in exchange for $2,000. The bag of powder was subsequently sent to the DEA Laboratory for analysis where the bag of powder tested positive for the presence of heroin. The transaction was recorded with both audio and video recording devices.

9. On August 14, 2018, the CI contacted TRENT to arrange the purchase of heroin by calling Phone #2. TRENT directed the CI to the SUBJECT PREMISES. Upon arriving at the SUBJECT PREMISES the CI called TRENT by calling Phone #2. Subsequently, the CI observed TRENT exist SUBJECT PREMISES #1. TRENT then directed the CI to SUBJECT PREMISES #2. TRENT and the CI entered SUBJECT PREMISES #2 where TRENT handed the CI a bag of powder in exchange for $2,000. The transaction was recorded with both audio and video recording devices. The bag of powder was subsequently sent to the DEA Laboratory for analysis where the bag of powder tested positive for the presence of heroin. The transaction was recorded with both audio and video recording devices.

10. On September 7, 2018, the CI contacted TRENT to arrange the purchase of heroin by calling Phone #2. TRENT told the CI that TRENT was currently out of town, and that if the CI required heroin, the CI should contact TRENT the week of September 10, 2018.

11. On September 11, 2018, the CI contacted TRENT to arrange the purchase of heroin by calling Phone #2. TRENT directed the CI to the SUBJECT PREMISES. Upon arriving at the SUBJECT PREMISES the CI called TRENT by calling Phone #2. Subsequently, the CI observed TRENT exist SUBJECT PREMISES #1. TRENT then directed the CI to SUBJECT PREMISES #2. TRENT and the CI entered SUBJECT PREMISES #2 where TRENT handed the CI a bag of powder in exchange for $1,000. The transaction was recorded with both audio and video recording devices. The bag of powder was subsequently filed tested and was "positive" for the presence of heroin. The bag is currently being tested by the DEA laboratory. The transaction was recorded with both audio and video recording devices.

12. On May 27, 2018, TRENT was arrested in Suffolk County New York, for Driving While Intoxicated. TRENT listed his address as the SUBJECT PREMISES.

13. Based on my training and experience and the information provided above, there is probable cause to believe that TRENT has possessed and distributed, and continues to possess and distribute, heroin, fentanyl and/or fentanyl analogues utilizing the SUBJECT PREMISES.

### B. EVIDENCE COMMONLY FOUND AT RESIDENCES OF DRUG TRAFFICKERS

14.  Based on my training, experience, participation in other drug investigations, debriefing of confidential informants and extensive discussions with other experienced law enforcement officers, I am familiar with the typical distribution and trafficking methods used by drug dealers and traffickers, including the distribution of heroin, fentanyl and/or fentanyl analogues.

15.  In a substantial number of residential, commercial and vehicular searches executed in connection with drug investigations, the following kinds of drug-related evidence have typically been recovered:

    a.  Members of drug organizations maintain records, including addresses, telephone and pager numbers of their criminal associates, including information pertaining to their sources of supply and customers, in address books, electronic organizers and on other media, physical or electronic;

    b.  Telephone bills and records of calls to telephones and pagers are also maintained for lengthy periods of time in defendants' homes and vehicles. Such records constitute important corroborative evidence in drug conspiracy cases because the defendants call one another regularly, especially just before and after an incident involving an act committed in furtherance of the conspiracy;

    c.  Drug traffickers frequently maintain in their residences or vehicles, often times referred to as "stash" locations quantities of controlled substances. They also maintain paraphernalia for packaging and distributing controlled substances, such as scales, plastic bags, heat-seal devices, and other items;

d.  Drug traffickers frequently maintain books, records, receipts, notes, ledgers, and other documents relating to the ordering, sale and distribution of drugs. Such documents are generally maintained where the traffickers have ready access to them, such as the traffickers' residences and vehicles;

e.  Drug traffickers frequently maintain financial records evidencing the deposit and transfer of monies in their homes. Such documents are generally maintained where the traffickers have ready access to them, such as the traffickers' residences; and

f.  Drug traffickers frequently maintain cellular telephones in their residence and cars, which often includes information pertaining to their sources of supply, customers and criminal associates.

16.  Based upon my training and experience, as well as my discussions with other law enforcement officers, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances for their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their trafficking business.

17. It is also a common practice for traffickers to conceal at their residences, or inside their vehicles, large quantities of United States currency, either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, drug traffickers frequently make use of wire transfers, cashiers' checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences and/or offices.

18. Finally, I know, from both my professional and personal experiences that people often maintain their cellular telephones in their residences. In your deponent's experience and training, illicit dealers of controlled substances commonly utilize cellular telephones to conduct their business, as the nature of their business often requires travel to procure and/or sell their product.

## IV. CONCLUSION

19. As set forth above, TRENT, who utilizes SUBJECT PREMISES #1 and SUBJECT PREMISES #2 is being investigated for, among other things, conspiracy to distribute and distribution of heroin. Moreover, as set forth above, with regard to the SUBJECT PREMISES, there is probable cause to believe that evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846, including the items described herein, will be kept therein.

WHEREFORE, I respectfully request that search warrants be issued, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, authorizing members of HSI and other law enforcement officers, to search SUBJECT PREMISES #1 and SUBJECT PREMISES #2, and therein to seize certain property, namely:

(1) drugs, drug paraphernalia, scales, drug residue, dilutants and materials related to distributing and/or manufacturing drugs;

(2) books and records, showing cash transactions, prices and quantities of drugs bought and sold;

(3) books and records showing the names, addresses and telephone numbers of purchasers and suppliers of drugs, as well as the identities of confederates in drug trafficking;

(4) pagers, electronic organizers, cellular telephones and related bills and receipts;

(5) firearms, including firearm ammunition, shell casings, discharged rounds and holsters;

(6) motor vehicle records, telephone bills, property records showing ownership of assets purchased with drug proceeds;

(7) banking and financial records, to include wire transfer receipts, bank deposit and withdrawal slips and any other documents evidencing financial transactions conducted with proceeds;

(8) currency used to purchase drugs, or reflecting proceeds of sales of drugs;

(9) photographs, photographic negatives (developed and undeveloped) surveillance cameras and corresponding electronic media, and video tapes or disks, which show the identities of conspirators, contraband, and evidence of drug trafficking; and

all of which constitute evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846.

Because disclosure of the contents of this Affidavit would jeopardize an ongoing investigation, threaten the safety of witnesses or result in the destruction of

evidence, it is further requested that this Affidavit and search warrant be sealed and remain under seal until further order of the Court.

_____
DAVID VALE
Special Agent
Department of Homeland Security
Homeland Security Investigations

Sworn to before me this
26 day of September, 2018

_____
THE HONORABLE GARY R. BROWN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

# Exhibit A



# Exhibit B



## ATTACHMENT A
Property to Be Searched

The "established" residence located at 248 Poospatuck Lane, Mastic Beach, New York ("SUBJECT PREMISES #1"). 248 Poospatuck Lane is located near a white picket fence with a mailbox attached bearing the number "214." The Sitting Bull Smoke Shop is located directly south of SUBJECT PREMISES #1. The SUBJECT PREMISES share an approximately 50-foot asphalt driveway. The driveway is located approximately 50 feet to the north of the mailbox bearing "214." SUBJECT PREMISES #1 is a tan one-level ranch style home, with approximately six windows with burgundy colored shutters. SUBJECT PREMISES #1 has a small wooden porch on the south side of the structure with approximately three steps. There is an entrance to SUBJECT PREMISES #1 located to the west at the top of the three steps. The south side of SUBJECT PREMISES #1 has a larger wooden porch with white railings and steps leading to an entrance door of the residence. There is a detached garage located behind the SUBJECT PREMISES #1. A picture of SUBJECT PREMISES #1 follows:



## ATTACHMENT B
Property to Be Searched

The under construction residence located at 248 Poospatuck Lane, Mastic Beach, New York ("SUBJECT PREMISES #2"). SUBJECT PREMISES #2 is a blue colored, two-story center hall colonial residence, which is currently under construction. SUBJECT PREMISES #2 has trim surrounding the windows and gutters. SUBJECT PREMISES #2 has a portico supported by two white columns directly over the front entrance to the residence. SUBJECT PREMISES #2 has a two-car attached garage on the N/S/E/W side of house. A photograph of SUBJECT PREMISES #2 is attached hereto as Exhibit B and incorporated by reference herein. A picture of SUBJECT PREMISES #2 follows:



## Attachment C
### Property to be Seized

Seize certain property all of which constitute evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846, namely:

(1) drugs, drug paraphernalia, scales, drug residue, dilutants and materials related to distributing and/or manufacturing drugs;

(2) books and records, showing cash transactions, prices and quantities of drugs bought and sold;

(3) books and records showing the names, addresses and telephone numbers of purchasers and suppliers of drugs, as well as the identities of confederates in drug trafficking;

(4) pagers, electronic organizers, cellular telephones and related bills and receipts;

(5) firearms, including firearm ammunition, shell casings, discharged rounds and holsters;

(6) motor vehicle records, telephone bills, property records showing ownership of assets purchased with drug proceeds;

(7) banking and financial records, to include wire transfer receipts, bank deposit and withdrawal slips and any other documents evidencing financial transactions conducted with proceeds;

(8) currency used to purchase drugs, or reflecting proceeds of sales of drugs; and

(9) photographs, photographic negatives (developed and undeveloped), surveillance camera and corresponding electronic media, and video tapes or disks, which show the identities of conspirators, contraband, and evidence of drug trafficking.